UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RANDALL OSBORNE,

                       Petitioner,            03 Civ. 2761 (RJH) (DF)

    -against-

                                                 **MEMORANDUM OPINION
                                                     AND ORDER**

DAVID L. MILLER, Superintendent, Eastern
Correctional Facility,

                       Respondents.

---

       Pro se petitioner Randall Osborne seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction for burglarizing a hospital. A jury found Petitioner guilty of four counts of burglary in the second degree, and one count each of petit larceny and possession of stolen property in the fifth degree. Petitioner was sentenced to a term of sixteen years to life imprisonment, which he is currently serving at the Easter Correctional Facility in Napanoch, New York.

       On June 28, 2006 Magistrate Judge Debra Freeman issued a Report and Recommendation ("Report") recommending that Osborne's petition be denied. Petitioner filed timely objections to the Report. For the reasons that follow, this Court adopts the Report and denies the petition.

## BACKGROUND

The background and relevant procedural history are set forth in Judge Freeman's Report, familiarity with which is assumed. The facts relevant to this Opinion are briefly highlighted here.

On the evening of Sunday, June 29, 1997, Dr. Mario DiTullio, a Columbia Presbyterian Medical Center ("CPMC") cardiologist, discovered that his keys were missing. (Report at 2.) With the help of a security officer, he transferred some of his office's equipment to another room—leaving his computer, monitor, printer, and calendar in the office—and locked the office with the security officer's keys. (*Id*. at 3.).

That night, security guard Teresa McGourty was assigned to work from 11:30 p.m. until 8:00 a.m. the following morning in the Babies Hospital, a part of the medical center complex.[1] At 6:45 a.m. on June 30, McGourty, sitting in the front desk of the Babies Hospital's south entrance lobby, saw Petitioner, dressed in scrubs and carrying two large shopping bags, heading for the building's exit. (*Id*. at 4–5.) She called him over to verify the contents of the shopping bags. (*Id*. at 5.) Petitioner explained that he was "cleaning out his office;" McGourty asked him to approach, and Petitioner, placing his bags on a chair, stood about a foot from McGourty while their conversation continued. (*Id*.) As she looked through the bags, McGourty asked Petitioner to identify himself; Petitioner was reluctant, failing to respond or to produce his identification card. (*Id*.) McGourty became suspicious and called for an additional security unit. Petitioner then began backing away from the desk, saying, "I'll be right back, I'll be right back;" he

---

[1] Interior corridors connect the Babies Hospital, the Presbyterian Hospital, and the emergency room to one another. While the general public was allowed in the emergency room area, security passes were required for access to any other part of the hospital. (Report at 4 n.4.)

2

eventually turned and exited the building. The encounter had lasted approximately three to five minutes. (*Id*.)

The contents of the shopping bags were identified as DiTullio's computer tower, printer and calendar. (*Id*. at 3, 5.) McGourty, along with security investigator James Verdicchio, viewed a security videotape of the incident later that morning. (*Id*. at 5.) McGourty recognized the man in the tape as the man she had encountered earlier that morning. (*Id*.) She returned to work at 11:15 p.m. on June 30, and at the daily roll call, she heard a routine advisory reporting her encounter with, and her description of, the scrub-clad man. (*Id*.)

Three days later, on the night of July 3, 1997, security guards Steven Brown and Robert Gojani were on duty in the emergency room. (*Id*. at 6.) Earlier that day, they had both received a description from Sergeant Julio Pujlos of a thin black male at least six feet tall, with a mustache and goatee, wearing some sort of identification card and a scrub suit, who had attempted to leave the Babies Hospital with some hospital equipment. At 9:45 p.m., Brown and Gojani spotted a man fitting that description as he entered an area reserved for authorized personnel. (*Id*.) In court, Brown and Gojani identified Petitioner as the man they saw walk into the emergency room that night. They followed and stopped Petitioner as he reached a corridor leading to other hospital buildings. The guards asked him if he needed any assistance; Petitioner replied that he was looking for a patient, Kathy Williams. They asked why he had not inquired about the patient at the front desk, and Petitioner replied that he thought the patient could be at the Millstein Hospital building. At that point, Brown radioed for his supervisor, Sergeant Pujlos, who, with Brown, and Gojani led Petitioner to a reception desk. (*Id*. at 7.) A computer records

search revealed no patient named Kathy Williams, and, while the guards continued to question Petitioner about the nature of his visit to the hospital, Brown noticed a light blue top peaking out from under Petitioner's outer shirt. (*Id*.)  Upon the guards' request, Petitioner raised his outer shirt and revealed a surgical scrub shirt underneath. (*Id*.)  The officers escorted Petitioner to the security office, searched him, and placed him under arrest for trespassing. (*Id*.)  The search of Petitioner revealed an identification card attached to a chain and two sets of keys, one of which carried the label of "property of Presbyterian Hospital," as well as a dark blue shopping bag containing another set of scrubs. (*Id*.)

Pujlos notified McGourty that he had a man "matching the description she had given" in detention and called her to the security office for purposes of identification.[2] (*Id*. at 8.)  When McGourty arrived, she found the desk officers busy and proceeded into the conference room of the security office to look for a colleague. (*Id.*)  Upon entering the room, McGourty saw Petitioner sitting a few feet away from her, at the head of a long conference table at which four to six other people were seated. (*Id*.)  Immediately recognizing him as the man who had tried to leave Babies Hospital with the two shopping bags of equipment four days prior, McGourty approached Petitioner and asked if he remembered her. (*Id*.)  Petitioner looked at McGourty, did not respond, and "put his head back down." (*Id*.)

At trial, Petitioner moved to suppress two show-up identifications: the one by McGourty and another not relevant for purposes of this opinion. (Report at 9.)  The trial court granted his request, finding that the procedures used by the officers to obtain out-

---

[2] Although suppressed by the trial court, defense counsel elicited the testimony from McGourty about the showup identification during cross-examination.  (Report at 7 n.5.)

4

of-court identifications were inappropriate and unduly suggestive. (*Id.*) Two independent source hearings were subsequently held before the trial court to determine whether each identifying witness had an independent source upon which to base an in-court identification of Petitioner. (*Id.*) The trial court found that the testimony was "more than sufficient" to show that the testifying witnesses—including McGourty—had a valid source upon which to base in-court identifications, one independent of the tainted show-up identification. McGourty, as a result, was permitted to identify Petitioner in court. (*Id.*)

At trial, Petitioner presented a misidentification defense, claiming that he had never entered the hospital on June 29 or June 30, and that on July 3 he visited the hospital to find his friend, Kathy Williams. (*Id.* at 12–13.) He explained the second set of scrubs as something for his friend to wear, and claimed that he had found the hospital keys lying on the floor outside of the emergency room but, because of poor lighting outside, he was unable to make out what type of keys they were. (*Id.*) Nonetheless, on March 23, 1998 a jury convicted Petitioner of four counts of burglary in the second degree, once count of petit larceny, and one count of criminal possession of stolen property in the fifth degree. (*Id.*)

On appeal, Petitioner argued, inter alia, that the trial court had erroneously permitted McGourty to identify Petitioner in court due to the tainted nature of the identification. According to Petitioner, the security videotape (which he also argued had been improperly admitted), the show-up identification, and the viewing of a single photograph taken of Petitioner while in custody prior to trial all had tainted McGourty's identification testimony to such a degree that it was no longer admissible. (*Id.* at 13, 14

n.4.) The Appellate Division, agreeing with the trial court's independent source determination and disposing of Petitioner's other arguments, affirmed the conviction. (*Id*. at 14.) On March 6, 2002, Petitioner's application for leave to appeal to the Court of Appeals was denied. *People v. Osborne*, 97 N.Y.2d 759 (2002). On March 17, 2003, Petitioner timely filed his habeas petition under 28 U.S.C. § 2254, arguing that he was denied his right to a fair trial and appeal as a result of several evidentiary errors, and that he was also denied the effective assistance of appellate counsel. (Pet. at 3–4.) The Report found Petitioner's claims unavailing, and recommended denying Petitioner's application for habeas.

## DISCUSSION

### I. Standard of Review

#### A. AEDPA

Under 28 U.S.C. § 2254, when a claim has been adjudicated on the merits in state court proceedings, habeas relief may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." For the purpose of this review, "clearly established Federal Law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The court presumes that factual findings by a state court are correct unless petitioner rebuts this presumption with "clear and convincing

6

evidence." 28 U.S.C. §§ 2254(d)(1), (d)(2), (e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)) (holding the standard for rebuttal of presumption of correctness is "demanding but not insatiable.")

### B.    Review of Magistrate Judge's Report

A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within ten days of service of the recommendation, any party may file written objections to the magistrate's report. *Id*. Upon review of those portions of the record to which objections were made, the district court judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Reviewing courts should review a report and recommendation for clear error where objections are "merely perfunctory responses," argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition." *Vega v. Artuz*, No. 97 Civ. 3775 (LTS), 2002 U.S. Dist. LEXIS 18270, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002); *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997). However, the court is required to make a de novo determination of those portions of a report to which objection is made. 28 U.S.C. § 636(b)(1)(C).

Almost all of Petitioner's objections here are reiterations of the arguments made to, and rejected by, Judge Freeman. (Objections at ¶¶ 3, 5–10.) "It is improper for an objecting party to attempt to relitigate the entire content of the hearing before the Magistrate Judge by submitting papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to

the Magistrate Judge." *Camardo v. General Motors Houlry-Rate Employees Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (dismissing objections where defendant attempted to rehash its original argument). Thus, with respect to those objections that are only a reiteration of Petitioner's prior arguments, Judge Freeman's findings and recommendations are reviewed only for clear error. This Court will, however, review one of the Report's findings and recommendations de novo, in light of Petitioner's more specific objection. (Objections at ¶ 4 (objecting to Report's independent source analysis and determination).)

This Court hereby adopts the Magistrate's Report with the additional analysis discussed below.

**II.     Petitioner's Objection**

Petitioner objects to the Report's findings and its recommendation with respect to the propriety of Petitioner's in-court identification. (Objections at 4–5.) In his petition, Osborne alleged that the trial court's admission of McGourty's in-court identification represented a violation of due process. (Pet. at 4; Pet. Reply Mem. at 7–8.) Petitioner claims that the in-court identification had been corrupted by an unduly suggestive out-of-court identification procedure. *Id*. Judge Freeman noted that an impermissibly suggestive out-of-court identification procedure does not render an in-court identification inadmissible as long as the government can establish, "by clear and convincing evidence," *U.S. v. Wade*, 388 U.S. 218, 240 (1967), that "considering the totality of the circumstances, there is sufficient evidence of reliability apart from the tainted identification." *Ortiz v. Artuz*, 113 F. Supp. 2d 327, 337 (E.D.N.Y. 2000), (finding,

despite suggestive show-up, witness's prior knowledge of suspect, physical description, and identification by name sufficiently reliable) (citing *Manson v. Brathwaite,* 432 U.S. 98 (1977)).  In other words, an opportunity to identify the suspect that is sufficiently independent of an unlawful identification procedure will allow reliance on the witness's identification testimony.

Generally, courts consider five factors in assessing whether an in-court identification is independently reliable.  *See Ortiz v. Artuz*, 113 F. Supp. 2d 327 at 337.  These are: the opportunity of the witness to view the accused at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the accused, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  *See Neil v. Biggers* 409 U.S. 188, 199-200 (1972).  The Report described McGourty's ample opportunity to observe petitioner in the early morning hours of June 30, and identified the other four factors as relevant.  However, the Report did not examine these latter factors in detail.  As Petitioner objects to the lack of discussion of all five factors, the Court reviews de novo the Report's determination that the in-court identification was independently reliable.  For the reasons that follow, the Court adopts the Report's finding of reliability

   *1. Opportunity To View The Criminal At The Time Of The Crime*

The facts clearly show that McGourty had ample opportunity to observe petitioner in the early morning hours of June 30, 1997.  (Report at 22.)  In fact, McGourty and petitioner had a face-to-face conversation that morning.  After McGourty saw petitioner heading for the exit, she called him over and questioned him, searched through the bags he was carrying, asked him to identify himself, and called for an additional security unit

9

as petitioner stood directly in front of her.  After this exchange, petitioner backed away from McGourty's security—hence still facing her—and left the building.  (Report at 5.)  For at least three and as long as five minutes, McGourty—whose occupation as a security guard requires close attention to those around her—directly faced and questioned petitioner.  McGourty unquestionably had a significant opportunity to observe and identify petitioner, and considerably shorter opportunities to view a suspect have been upheld as sufficiently reliable.  *See, e.g.*, *Mysholowsky v. People,* 535 F.2d 194 (2d Cir.1976) (witnesses viewed robber for forty-five seconds); *Brown v. Tracy*, 299 F. Supp. 2d 77, 80 (E.D.N.Y. 2004) (witness viewed robber for fifteen seconds).  This factor lends strong support to a determination of reliability.

    *2. Witness's Degree Of Attention*

There is a clear indication that McGourty was not merely a casual observer; her position as a security guard at the hospital's front desk heightened her attentiveness to petitioner's features.  McGourty eyed petitioner—a man in scrubs carrying out two large bags of office supplies at 6:45 a.m.—suspiciously; she did not allow him to leave the hospital, questioned his motives and actions, and searched his bags.  (Report at 5.)  Furthermore, after petitioner failed to identify himself to her, McGourty became more suspicious and determined that additional security units were necessary, *id.*, strongly suggesting McGourty's heightened state of attention and vigilance with regards to petitioner's actions.  On direct examination, McGourty testified that she maintained visual contact with the defendant at all times, even while inspecting the contents of the bags, as she "didn't want to lose sight of him." (Tr. at 177.)  This factor also lends strong support to a determination of reliability.

10

### 3. *Accuracy Of McGourty's Prior Description*

Soon after her encounter with Petitioner, McGourty described Petitioner in a written report. (Tr. at 216:22–24.) Though the record does not directly reveal McGourty's description, at trial McGourty testified that the description issued by the Hospital's security department to her and other guards—thin black male at least six feet tall, with a mustache and goatee, wearing some sort of identification card and a scrub suit (Report at 6)—was based on her own description. (Tr. at 231:14–16.) Hence, it is reasonable to infer that she described Petitioner as being over six feet tall, having a beard and mustache, and wearing scrubs. Petitioner does not challenge the accuracy of this description; he only attacks it as "vague." (Objections at ¶ 4.) Yet the description was neither vague nor is there any allegation of it being inaccurate. Importantly, it was McGourty's very description that ultimately led to identifying and apprehending Petitioner. Thus, this factor does not undermine a determination of reliability.

### 4. *Level Of Certainty Demonstrated By The Witness At The Confrontation*

Though the Report does not reference any statements made at the time of confrontation by McGourty indicating her level of certainty that petitioner was the suspect from three days prior, McGourty's conduct suffices to demonstrate her certainty. Upon entering the conference room in which petitioner sat with four to six other people, McGourty immediately approached petitioner and asked him if he remembered her. (Report at 8.) McGourty hence addressed herself to petitioner directly and without hesitation immediately upon entering the room, clearly referencing their prior meeting and emphasizing her unequivocal belief that she was talking to the same person.

11

Petitioner may argue that the circumstances' suggestive nature inevitably colored McGourty's reaction and demonstrated certainty. Indeed, "the extent to which an affirmative identification is the product of prodding" undermines the witness's level of certainty. *See Dickerson v. Fogg*, 692 F.2d 238, 246 (2d Cir. 1982) (noting, in addition to police officer's prodding, witness's stated hesitancy and inability to positively identify suspect as indicators of witness' lack of certainty at confrontation). Here, however, there is no indication that McGourty was anything but affirmatively certain petitioner was her suspect. Thus, this factor lends further support to a determination of reliability.

   *5.   Length Of Time Between The Crime And The Confrontation*

McGourty's encounter with petitioner took place on the morning of Monday, June 30, 1997, and their subsequent confrontation took place on the night of Thursday, July 3, four days later. (Report at 5–8.) A four-day period will have little, if any, effect upon a witness's recollection, particularly when considered in relation to other time lags that courts have found do not substantially affect reliability. *See generally United States v. Wong,* 40 F.3d 1347, 1360 (2d Cir. 1994), *cert. denied*, 516 U.S. 870 (1995) (holding that a thirty-one month delay could be outweighed by other indicia of reliability); *Brown*, 299 F. Supp. 2d at 80 ("[A] two month lag between the incident and initial confrontation is not fatal."). This factor does not call the reliability of McGourty's identification into question.

In sum, the *Biggers* criteria clearly lead to a determination that the in-court identification was independently reliable. The trial court's finding that McGourty had an

12

independent source for her identification was neither contrary to nor an unreasonable application of federal law, see 28 U.S.C. § 2254(d), and Petitioner's claim fails.

## CONCLUSION

For the reasons stated above, the Court adopts the Report and denies the petition for a writ of habeas corpus. In addition, the Court declines to issue a certificate of appealability. The petitioner has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. *See Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998). The Court also finds pursuant to 28 U.S.C. 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962). The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
       May 30, 2008

/s/ Richard J. Holwell
Richard J. Holwell
United States District Judge